```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE NORTHERN DISTRICT OF TEXAS

 3                             DALLAS DIVISION

 4
     UNITED STATES OF AMERICA,      )        3:20-CR-451-N
 5                 Government,       )
                                    )
 6                                  )
     VS.                            )        DALLAS, TEXAS
 7                                  )
                                    )
 8   CHARLES DAVID BURROW,          )
                   Defendant.       )        December 7, 2020
 9

10
                     TRANSCRIPT OF DETENTION HEARING
11
               BEFORE THE HONORABLE REBECCA RUTHERFORD
12
                     UNITED STATES MAGISTRATE JUDGE
13

14
     A P P E A R A N C E S:
15

16
     FOR THE GOVERNMENT:          MR. DAVID L. JARVIS
17                                UNITED STATES DEPARTMENT OF JUSTICE
                                  NORTHERN DISTRICT OF TEXAS
18                                U.S. Courthouse, Third Floor
                                  1100 Commerce Street
19                                Dallas, Texas  75242
                                  david.jarvis@usdoj.gov
20                                (214) 659-8729

21

22

23

24

25
```



```
 1   FOR THE DEFENDANT:              MR. JOHN S. WILSON
                                    Law Office of Jack Wilson
 2                                  3300 Oak Lawn
                                    Suite 600
 3                                  Dallas, Texas  75219
                                    jswilson@msn.com
 4                                  (214) 520-7778

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18
     COURT REPORTER:                MR. TODD ANDERSON, RMR, CRR
19                                  United States Court Reporter
                                    1100 Commerce St., Rm. 1625
20                                  Dallas, Texas  75242
                                    (214) 753-2170
21

22

23           Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                  DETENTION HEARING - DECEMBER 7, 2020
 2                      P R O C E E D I N G S
 3            THE COURT:  The Court calls United States of America
 4   versus Charles Burrow.  This is Case 3:20-CR-451-N.
 5            May I have appearances, please?
 6            MR. JARVIS:  David Jarvis for the Government, Your
 7   Honor.
 8            THE COURT:  Good morning.
 9            MR. JARVIS:  Good morning.
10            MR. WILSON:  Jack Wilson for Mr. Burrow.
11            THE COURT:  Good morning.
12            MR. WILSON:  Good morning, Judge.
13            THE COURT:  All right.  I have a hearing set for the
14   Government's motion for detention.
15            Is the Government prepared to proceed?
16            MR. JARVIS:  Yes, Your Honor, the Government is
17   ready.
18            THE COURT:  All right.  Is the defense ready?
19            MR. WILSON:  Yes, Judge.
20            THE COURT:  All right.  Go ahead, Mr. Jarvis.  Call
21   your first witness.
22            MR. JARVIS:  Your Honor, at this time we would call
23   Deputy Sheriff Cody Dale.
24            THE COURT:  Sir, if you would come up to the witness
25   stand, please.
```

```
 1              Raise your right hand.
 2              (The witness was sworn)
 3              THE COURT:  Thank you.
 4              Please have a seat.
 5              MR. JARVIS:  Your Honor, do you want me to remain
 6   here or over there?
 7              THE COURT:  I can hear you just fine from there, so
 8   you're more than welcome to stay there.
 9              MR. JARVIS:  Very good.
10              CODY COLE, GOVERNMENT'S WITNESS, SWORN
11                        DIRECT EXAMINATION
12   BY MR. JARVIS:
13   Q.   For the record, would you state your name and spell it?
14   A.   It's Cody Cole, C-O-D-Y, C-O-L-E.  And I'm an investigator
15   with the Ellis County Sheriff's Office, special investigations
16   unit, which is the narcotics unit for the county.
17   Q.   Okay.  How long have you been in the field of law
18   enforcement?
19   A.   I've been a police officer for 15 years now.
20   Q.   All right.  And how long have you been with the Ellis
21   County Sheriff's Department?
22   A.   Since 2009.  And I've been in narcotics for nine years.
23   Q.   Okay.  And tell me how you first came into contact with
24   the Defendant, Charles David Burrow.
25   A.   In Ellis County we began an investigation into the
```

1  distribution of methamphetamine after having an overdose death

2  that occurred on a person that was traffic stopped in Ellis

3  County.

4        Beginning this investigation, we started identifying

5  persons that --

6  Q.   Hold on just a second.  Would you give me a timeframe?

7  A.   This was in early 2019, mid-2019.

8  Q.   And do you see Mr. Burrow in the courtroom, and could you

9  identify him?

10 A.   Yes.  He's next to defense counsel, wearing the brown

11 jumpsuit.

12 Q.   All right.

13        MR. JARVIS:  Your Honor, could the record reflect

14 he's identified the Defendant?

15        THE COURT:  Yes, it will.

16 BY MR. JARVIS:

17 Q.   All right.  So please continue.

18        The OD was about what timeframe?

19 A.   Mid-2019.

20 Q.   Okay.  And the overdose of what drug?

21 A.   Methamphetamine.

22 Q.   All right.  And please continue.

23 A.   Yes.

24        During our investigation, we identified numerous

25 targets that were involved in the distribution of

 1   methamphetamine.  Mr. Burrow was identified as one of those

 2   targets.  We conducted an investigation into those people and

 3   had eight other co-conspirators that were indicted separately

 4   from Mr. Burrow.

 5           We required more investigation into Mr. Burrow to be

 6   able to indict him, and we led -- that led to August of 2019 --

 7   I'm sorry -- 2020, where we conducted a controlled purchase of

 8   methamphetamine from Mr. Burrow.  And that led to a search

 9   warrant at his residence on August 13th of 2020.

10           After he was -- he was arrested that day also by the

11   Red Oak Police Department on a random traffic stop and found to

12   be in possession of a distribution amount of methamphetamine.

13   Q.   Okay.  Just -- back up the timeline a little bit here.

14           The controlled buy was early -- early afternoon on

15   August 12th of this year; is that right?

16   A.   That is correct.

17   Q.   And the controlled buy was about what amount of

18   methamphetamine?

19   A.   It was 8.8 grams, is what the weight ended up being, which

20   is a distribution amount as well.

21   Q.   All right.  And, basically, in a controlled situation you

22   sent somebody into his house there in Red Oak?

23   A.   Correct.

24   Q.   Made the buy, came back, and he had 8.8 grams, right?

25   A.   Correct.

1    Q.   And then later that night, did you get notification from
2    Red Oak PD about a traffic stop?
3    A.   Yes.
4    Q.   Tell us about.
5    A.   Yes, I did.
6          One of the Red Oak officers who was aware of my
7    investigation into Mr. Burrow had called me and let me know
8    that he had conducted a random traffic stop on Mr. Burrow's
9    vehicle.  He was the driver.
10         He was a K-9 officer, utilized his K-9 to get
11   probable cause to search that vehicle.  And Mr. Burrow was
12   found in possession of 5.5 grams of methamphetamine.
13   Q.   In addition to the methamphetamine -- this, again, was the
14   same day, later that night, August the 12th, right --
15   A.   That is correct.
16   Q.   -- of the traffic stop?
17         Did he have cash on him?
18   A.   Yes, he did.
19   Q.   How much?
20   A.   I think it was like $1,400.00.  That could be --
21   Q.   Okay.  $1,897.00, does that sound about right?
22   A.   That does sound right, yes, sir.
23   Q.   Okay.  And then moving forward to the -- based upon the
24   results of the controlled buy and the traffic stop, did you
25   obtain a search warrant that you executed early in the morning

1  hours of August 13th?

2  A.   I did.

3  Q.   And tell us about that.

4  A.   We did execute that search warrant at his house after he

5  was arrested.  No one was found there.  We used his keys to get

6  into the house.  In the house we located 371 grams of

7  methamphetamine in his bathroom, which is --

8  Q.   Now, hold on.  This is the August 13th search warrant,

9  right?

10  A.   Yes.

11  Q.   That's what I'm asking about.

12  A.   Yes.

13  Q.   Did you have his keys at that time?

14  A.   Yes.  He was arrested by the Red Oak Police Department.

15  Q.   Okay.  And how many total grams seized at the house of

16  methamphetamine?

17  A.   372.8 grams of methamphetamine that day.

18  Q.   In addition to meth, what else was found inside the house?

19  A.   55 grams of GHB, which is typical of the date rape drug.

20  And we located digital scales, numerous items of packaging

21  material, handguns, and other evidence to suggest the drugs

22  were intended to be sold.

23  Q.   Okay.  Was there a loaded .40 caliber Smith & Wesson

24  pistol found with the drugs?

25  A.   Yes, it was.

```
1    Q.    That's in his house?

2    A.    That's correct.

3    Q.    Okay.  Now, did it later come to your attention -- was

4    there a report of an assault by Ashley Metcalf, M-E-T-C-A-L-F,

5    Ashley Metcalf, who was the former wife of the Defendant,

6    Mr. Burrow?

7    A.    Correct.

8    Q.    And tell us about that report.  I think it was on --

9    November 11 was the date of the report, but it related to an

10   assault on November 7; is that correct?

11   A.    That's correct.

12   Q.    Of this year?

13   A.    Correct.

14   Q.    Tell us about the nature of that assault.

15   A.    Okay.  So after the search warrant we had of Mr. Burrow's

16   house, we got Mr. Burrow indicted here in District Court for

17   his crimes for the drugs.  And then while continuing our

18   investigation, we were made aware that Ashley Metcalf had

19   called the police on November 11th about an assault that

20   occurred on the 7th at Mr. Burrow's house.

21         The details were that they were there arguing about

22   the child that they have together, and Mr. Burrow assaulted her

23   and then threatened to kill her if she was to call the police.

24   That was the reason she waited four days to call the police,

25   because she was in fear that threat may come true.
```

1   Q.   And I've read the report, something about she had a cell

2   phone in her hand and he -- he struck her and the cell phone

3   hit her in the face or the lip.  Is that -- tell us more about

4   that.

5   A.   Yeah, that's the details of the report.

6           I was not there for the actual assault report or

7   anything, but reading the report that the patrol deputy had

8   taken was she had something to do with her cell phone.  She

9   either was trying to make a phone call, and he grabbed and

10  thrust the phone into her face and caused the injury to her

11  lip.  It was a busted lip.

12  Q.   Okay.  And what -- did he make -- the threat to kill her

13  if she reported this assault to the police, was that after she

14  made a statement to him, or did he just voluntarily make that

15  threat on his own?

16  A.   No.  She -- as I remember the way the report reads, she

17  did say, "I'm going to call the police."

18          And he said, "No, I'm going to kill you if you call

19  the police."

20  Q.   But she eventually did --

21  A.   She did, yes.

22  Q.   -- four days later?

23          Okay.  Let's direct your -- moving down to November

24  24th.  The indictment was returned on September 22nd of this

25  year, the two-count indictment.  Tell us about the execution of

1  the arrest on that federal indictment on November 24th of this

2  year.

3  A.   All right.  So after the assault, we decided to progress

4  things a little quicker than we were trying to, but -- so we

5  just were conducting physical surveillance on Mr. Burrow's

6  residence.  We knew he left early morning hours most of the

7  time.  And so while conducting surveillance, Mr. Burrow was

8  seen coming from his house, getting into a truck.  We had a

9  marked squad car setting down the road.

10       We conducted a traffic stop on Mr. Burrow, identified

11  him, and took him into custody.  And he did let us know he had

12  more drugs inside his vehicle.

13  Q.   Okay.  And tell us about that.  Was he cooperative?

14  A.   Yes.

15       I read him his rights, and then he told us that he

16  had more methamphetamine.  He had some mushrooms and some THC

17  products in his truck, so we conducted a search and did find

18  another distribution amount of methamphetamine.  It was near 20

19  grams.  Digital scales that had methamphetamine residue on the

20  scale, indicating it was used to sell drugs.  He had psilocybin

21  mushrooms, some DMT, and some Alprazolam tablets, and some THC

22  in his truck with him.

23  Q.   All right.  And did you decide, based upon this new

24  information at the time of the arrest in the vehicle, to go

25  ahead and seek a search warrant on his home?

```
 1   A.   Again, yes, we did.
 2   Q.   The same home you had searched on early morning hours of
 3   August 13th?
 4   A.   That's correct.
 5   Q.   All right.  And did you execute that search warrant?
 6   A.   Yes, I did execute the search warrant.  He did tell us
 7   there was going to be some more GHB inside the house, and so we
 8   located 371 grams of GHB in his bathroom --
 9   Q.   Okay.
10   A.   -- at his house.
11   Q.   You're saying GHB, right?
12   A.   Right.
13   Q.   Golf Hotel Bravo, GHB?
14   A.   Right.
15   Q.   Okay.
16   A.   Gamma-hydroxybutyrate.
17   Q.   Got it.
18            Now, did you find more methamphetamine and more GHB
19   there on the scene?
20   A.   Yes.  In the house we found the 371 grams of GHB and then
21   just some drug paraphernalia associated with methamphetamine
22   use, pipes that were clearly used to smoke meth with.
23   Q.   Just over $1,600.00 in cash?
24   A.   That was on him at his arrest, yes, it was.
25   Q.   At the time of his arrest?
```

1    A.    Yes, it was.

2    Q.    All right.  Now, at the time of the arrest on November

3    24th of this year, was he already on bond at that time for the

4    arrest in August of this year?

5    A.    That's correct.

6    Q.    Okay.  So while he's on bond, he's still dealing drugs?

7    A.    That's correct.

8    Q.    Now, have you prepared a -- kind of a weight sheet that

9    I've given to Mr. Wilson, defense counsel, showing the total of

10    weight of methamphetamine and other drugs based --

11              Well, before we get into that, so after you did your

12    search, did you go back and ask Mr. Burrow if he wanted --

13    would he agree to be interviewed?

14    A.    That's correct.

15    Q.    Did he waive his rights to remain silent?

16    A.    Yes, he did.

17    Q.    Did he waive his right to counsel?

18    A.    Correct.

19    Q.    All right.  And based upon those waivers, did you go ahead

20    and do a video interview of Mr. Burrow?

21    A.    That's correct.  Yes, we did.

22    Q.    Could you briefly summarize what you learned during that

23    interview?  And that was, I guess, the same date, November 24th

24    of this year?

25    A.    Right.

1          We just, yes, conducted a post-Miranda interview, and

2    we discussed -- like we do with most typical people that we

3    arrest for drug trafficking, we talk about where their sources

4    of supply are, who potentially they sell to, and other ways we

5    can continue to combat the drug problem in Ellis County.

6          Mr. Burrow was, for the most part, cooperative.  He

7    did speak to us about things we already knew that were

8    documented in the investigation of the other eight

9    co-conspirators.

10          He did, you know, accept responsibility for weights

11   that we knew he was purchasing during that investigation and

12   then also told us about his sources of supply up until the

13   August search warrant whenever we arrested him.

14          After that August search warrant, he -- his supplier

15   was arrested a few weeks later, and he would not -- we did not

16   talk about who his current source of supply for methamphetamine

17   was.  He didn't want to speak about that.

18   Q.   All right.  You asked him, and he declined to identify his

19   current supplier as of November of this year?

20   A.   That's correct.

21   Q.   All right.  And you've reviewed the indictment, Count One,

22   conspiracy to possess with intent to distribute

23   methamphetamine, and Count Two is possession with intent to

24   distribute.

25          Based on your investigation, do you have evidence to

1    support each and every element of those two counts?

2    A.    That's correct.

3    Q.    All right.  And specifically the 500 grams or more in

4    Count One.

5              Tell us -- based upon your investigation of other

6    co-conspirators that were indicted prior to Mr. Burrow, based

7    upon phone records of Josh Wilson, based upon the debrief of

8    Mr. Burrow on November 24, would you break down -- well, just

9    the total drug weight of meth that you were able to calculate.

10   A.    Without Mr. Burrow's debrief, we were able to account for

11   at least 10,369 grams of methamphetamine that he was

12   responsible for trafficking.  And with his debrief, he did

13   substantiate some more weights, up to at least 23 kilograms of

14   methamphetamine that he was involved in purchasing and

15   trafficking during that time period that I was investigating

16   him.

17   Q.    I'm looking at your weight sheet.  Again, a copy has been

18   provided to defense counsel.  23,224 grams was your current

19   total weight calculation of methamphetamine that this defendant

20   was involved in in dealing?

21   A.    Correct.  That's correct.

22              MR. JARVIS:  Pass the witness, Your Honor.

23              THE COURT:  Thank you.

24

25

```
1                        CROSS-EXAMINATION
2    BY MR. WILSON:
3    Q.   How long have you been on this investigation again?
4    A.   Since mid-2019.
5    Q.   Okay.  And have you been familiar with Mr. Burrow since
6    then?
7    A.   Yes.  That's correct.
8    Q.   Okay.  Prior to the assault allegation, did you consider
9    him violent?
10   A.   I had information that he possessed weapons.  And so when
11   we had the search warrant, we would have -- we would have
12   requested a no-knock search warrant had he not been in custody.
13   So, yes, with the weapons and the drug dealing, I would say
14   that that would have been definitely a clue that that could
15   have been possible, yes.
16   Q.   Okay.  Do you know how long he's been with Ashley Metcalf?
17   A.   I do not know that.
18   Q.   Do you know of any other allegations of assaults or family
19   violence other than what is alleged to happen that day?
20   A.   No, sir, I don't.
21   Q.   Okay.  Have you personally spoken with her regarding that
22   case?
23   A.   Yes.
24   Q.   And did she tell you when he's clean she's not scared of
25   him?
```

```
 1    A.    That's correct.
 2    Q.    Okay.  Since you've been investigating him and even up
 3    until today, has anything given you reason to believe he would
 4    be a flight risk?
 5    A.    Flight risk, no.
 6    Q.    Okay.  You know he's got a 10-year-old daughter?
 7    A.    Yes.
 8    Q.    Okay.  You know he's got a job?
 9    A.    Correct.
10    Q.    Okay.
11          MR. WILSON:  No -- no further questions, Judge.
12    Thank you.
13          THE COURT:  Thank you.
14          Anything further, Mr. Jarvis?
15          MR. JARVIS:  Yes.
16                     REDIRECT EXAMINATION
17    BY MR. JARVIS:
18    Q.    Just a follow-up on that flight risk question.  Based upon
19    your information or your knowledge of his background, has
20    Mr. Burrow ever in his life been in this position before where
21    he's looking at 14 to 17 years in federal prison?
22    A.    No, not that I'm aware of.
23    Q.    So he's really never had that kind of motivation or
24    incentive to flee, has he?
25    A.    That's correct.
```

1  Q.   All right.

2           MR. JARVIS:  That's all we have, Your Honor.

3           THE COURT:  Thank you.

4           Officer, thank you very much.  You can step down.

5           THE WITNESS:  Thank you.

6           (Witness excused)

7           MR. JARVIS:  We have no further evidence to offer,

8  Your Honor.

9           THE COURT:  Thank you.

10          Mr. Wilson?

11          MR. WILSON:  We have no witnesses, Judge.

12          THE COURT:  All right.  Do you have anything you want

13  to proffer?

14          MR. WILSON:  Other than we would just ask the Court

15  to go along with Pretrial Services' recommendation, which is to

16  release him.  He would live with his mother.  He has his own

17  home, which he owns, but they would be selling that.

18          He has a job.

19          He's never been to prison.  He had a 10-year

20  probation that he lived out.

21          The woman that he's accused of assaulting he's been

22  with for 14 years.  And as the investigator said, she's not

23  scared of him when he's clean.  If he's released, he's going to

24  be -- he's going to have UA's put on him, so we're going to

25  know if he's clean or not.

1          He knows the consequences if he's let go and he

2    violates any of the conditions.

3          He has a 10-year-old daughter that he's extremely

4    close to.  And, obviously, I can't guarantee anything, Judge,

5    but I would -- I know for a fact that he would -- he wouldn't

6    do anything to jeopardize more time with his daughter.

7          So we would ask the Court to follow the

8    recommendation of release from Pretrial Services.

9          THE COURT:  Thank you.

10          All right.  The Court has before it the Government's

11   motion for detention, the -- oh, wait.

12          And for argument -- Mr. Jarvis, do you want to make

13   an argument?

14          MR. JARVIS:  Yes, Your Honor.

15          We clearly disagree with the recommendation of

16   Pretrial Services.

17          This defendant, based on the testimony and the

18   evidence before the Court, has known the consequences of his

19   actions for several years.  He suddenly is concerned about his

20   daughter for the last two years of his drug dealing.  He has

21   not been concerned as the testimony has indicated.

22          You put this man on bond, you do not slow him down.

23   He was on bond in August, continued to deal, and had weapons

24   and so on.

25          So we would ask the Court to detain Mr. Burrow based

1    on the evidence before the Court.

2         THE COURT:  And for the record, Mr. Jarvis, your

3    motion indicates that this is a presumption case; is that

4    correct?

5         MR. JARVIS:  It's a presumption case.  And we're

6    concerned about flight risk based upon the consequences and

7    also the safety of the community based on weapons and the

8    assault evidence.

9         To be -- and I don't know if I can get into this, but

10   I think Mr. Wilson knows that the wife, ex-wife, obviously is

11   concerned about her daughter and doesn't want her daughter to

12   be, you know, separated from her father, but it's a very --

13   it's an understandable position.  We would ask the Court to

14   take the larger view and detain Mr. Burrow.

15        THE COURT:  Thank you.

16        Mr. Wilson, would you like to make an argument?

17        MR. WILSON:  Judge, again, we would ask the Court to

18   follow Pretrial Services' recommendation that he be released

19   with the conditions that they laid out.

20        Like I said, this is a guy who's never been to

21   prison.  He lived out his 10-year probation.  We understand the

22   concerns, but he's got a home to go to, stable environment,

23   job.  And I just don't see him violating the conditions.

24        THE COURT:  Thank you.

25        The Court is going to grant the Government's motion.

 1            I am aware of the Pretrial Services recommendation;

 2    however, I believe that information that was elicited during

 3    the hearing today that was not reflected in the Pretrial

 4    Services report, so I believe maybe the officer did not have

 5    all of that information.

 6            Also, this is a presumption case, and so Congress has

 7    determined that this is the type of case where detention is

 8    warranted unless the Defendant can come forward with some

 9    evidence to rebut it.  I don't find that the evidence in the

10    Pretrial Services report is sufficient to overcome that

11    presumption.

12            I find that the Defendant is a flight risk especially

13    given his -- the sentence and the severity of sentence that he

14    is looking at and that he is a danger.

15            I don't find that there are any conditions I could

16    set that would reasonably assure his appearance or the safety

17    of the community and others.  And I'm very heavily influenced

18    by the fact that he was on release between August and November

19    and he continued to engage in criminal activity to deal

20    methamphetamine and other dangerous drugs and also to be in

21    possession of firearms.

22            So for those reasons, the Government's motion is

23    granted.

24            Thank you.

25            Unless there's anything further, we're adjourned.

1          MR. WILSON:  No, Your Honor.

2          MR. JARVIS:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you.

4          Good luck to you, Mr. Burrow.

5          (Hearing adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2                                                              Further
                          Direct   Cross   Redirect   Recross   Redirect
3
    WITNESS FOR THE
4   GOVERNMENT

5   CODY DALE                 4       16       17

6
    PROFFER:  Mr. Wilson....................................... 18
7
    ARGUMENT:  Mr. Jarvis...................................... 19
8
    ARGUMENT:  Mr. Wilson...................................... 20
9
    Court's ruling............................................ 20
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 21st day of January, 2020.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25